**UNITED STATES of America,**

v.

**Jose R. CABA, Defendant.**

**No. CR–94–1075 (DGT).**

United States District Court, E.D. New York.

Jan. 11, 1996.

---

Sung–Hee Suh, United States Attorney's Office, Eastern District of New York, Brooklyn, NY, for Plaintiff.

Gail Laser, New York City, for Defendant.

*OPINION*

TRAGER, District Judge:

On April 10, 1995, a jury found the defendant, Jose Caba, guilty of conspiracy to launder money in violation of 18 U.S.C. § 1956(g); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A); conspiracy to commit food stamp fraud, in violation of 18 U.S.C. § 371; and five counts of food stamp fraud, in violation of 7 U.S.C. § 2024(b)(1). The case was tried by visiting Judge Howard B. Turrentine. The matter is now on for sentencing and a number of issues have arisen in the process of determining a lawful and appropriate sentence.

## Background

### (1)

In 1992, after employees of Caba's store—Johnathan's (or Joe's) Grocery Store—accepted food stamps in return for non-food items, the United States Department of Agriculture ("USDA") suspended Caba's license to accept food stamps for three years. Shortly thereafter, in May 1992, Joselin Mejia, owner of Mejia Deli Grocery, gave Caba a power of attorney to handle Mejia's bank account in which Mejia deposited food stamps. PSR ¶¶ 5–6. Caba, thereafter, deposited food stamps into Mejia's bank account, certifying that they were accepted in accordance with USDA regulations. *Id.* at ¶ 7.

At trial, however, it was proven that these food stamps were not obtained in accordance with the certification. The chain of events was as follows: self-employed truck drivers purchased from wholesalers items which can be bought by food stamps as well as those which legally could not. At the same time, some retail stores accepted food stamps from customers even though these stores are not licensed to do so by the Department of Agriculture. Also, these stores accepted food stamps for items such as beer and cigarettes, which, under the USDA regulations, cannot be bought with food stamps. Even licensed stores are known to engage in this practice. Trial Tr. at 40–41. Since these unlicensed retail stores had no way to convert these food stamps into cash, they paid the truck drivers in food stamps for their merchandise. *Id.* at ¶ 8. Because the truck drivers, too, were not authorized to accept food stamps, they needed a way to convert the food stamps into cash.

Caba aided these truck drivers by redeeming these stamps for checks, made out to the wholesale companies or drivers, deducting four to five percent from the face value of the food stamps. At trial, the Government produced evidence of five transactions in which a cooperating, but non-testifying witness went to Caba's store and exchanged $20,650 worth of food stamps for cash at a five percent discount. *Id.* at ¶ 16.

Caba then made deposits of the accumulated food stamps into Mejia's bank account until 1994. Caba's deposits to Mejia's bank account through 1994 amounted to over $7,000,000. *Id.* at ¶¶ 9–10. At the end of April 1994, Caba began using the account of Caba Grocery which was owned by Caba's sister, Maritza Caba. The amount going through this account was approximately $4,500,000. *Id.* at ¶¶ 10–11. Caba also enlisted the help of at least four people—Joselin Mejia, Cruz Tavarez, Maritza Caba, and one of his workers. *Id.* at 55–62; 69–74; 110–11; 116–17; 175–77; 179–80; 305.

In sum, the Government showed that Caba devised a scheme by which he received food stamps which were funneled up from the groceries to the truck drivers to Caba or directly from Mejia Deli–Grocery or Bushwick Beer, a beer distributor. This scheme involved the use of food stamps for prohibited purposes, including the sale of non-eligible items such as alcohol and cigarettes with food stamps, as well as the "discounting" of the food stamps in exchange for cash. In addition, the scheme also indirectly facilitated unlicensed groceries' acceptance of food stamps. Testimony of Joselin Mejia, Trial Tr. at 66–67; 71–72.

Thus, the evidence at trial, viewed most favorably to the Government, established that Caba had laundered approximately $11,700,000 in proceeds from unauthorized food stamp transactions through the use of three bank accounts and two food stamp licenses in other people's names, making a personal profit of over $660,000 in the course of only two and a half years. Trial Tr. at 312–13. The Government, by cross examination of the defendant and from Mejia's testimony, also attempted to demonstrate Caba's structuring of his deposits under $10,000. Trial Tr. at 77, 323.

In addition to requesting that the court apply the money laundering guideline, § 2S1.1, Gov't Ltr.Br., dated 11/15/95, the Government requests that Caba's sentence be enhanced pursuant to Guideline § 3B1.1 because of his role in the offense—he was a leader directing the actions of Joselin Mejia, truck drivers (including Cruz Tavarez), Caba's store employees, Caba's sister, and

the owner of Bushwick Beer, a beer distributor. The Government maintains that he planned the offense, made the decisions, and recruited others to help in his scheme involving more than five participants. Addendum to PSR at 1.

The Government further requests an enhancement in Caba's sentence because it claims that he obstructed justice by committing perjury at trial. U.S.S.G. § 3C1.1. Specifically, the Government focuses on Caba's denial that he knew his actions were illegal at the time he conducted the financial transactions. Knowledge of the illegality was a necessity in order for the jury to find Caba guilty. Thus, according to the Government, Caba's testimony can only be viewed as consisting of false statements about a material issue in a court proceeding. *Id.* at 2. In addition, the Government maintains that there were two other instances of perjury at trial which related to Caba's dealings with Joselin Mejia. Gov't Ltr.Br., dated 9/25/95, at 3–4. According to the Government, he denied these dealings because, as the Government explains: "Caba apparently concluded that Mejia's testimony of their dealings had been particularly harmful to his defense.... This testimony obviously undermined Caba's attempt to portray his scheme as involving only food stamps that he thought had originated from actual sales of food." *Id.* at 6, fn. 4.

### (2)

Although the Government maintains that Caba's activities enabled unlicensed groceries to accept food stamps which then paid a 4% surcharge to Caba in order to redeem them, Caba contextualizes his actions explaining that groceries in impoverished areas deal almost exclusively in food stamps as currency because customers often do not have cash. Furthermore, and more relevant to his position here, he asserts that the truck drivers and most groceries cannot redeem the food stamps either because they are unlicensed or, even if licensed, the banks require that the retailer have significant minimum amounts

before they will accept deposits of food stamps. Thus, Caba asserts, he was openly providing a necessary service, a form of discounting akin to the discounting of commercial paper, to these small retailers and self-employed truck drivers. Trial Tr. at 288; 316–17.

With respect to the money laundering charge, Caba explained that he divided his deposits in less than $10,000 increments because the bank teller at Banco Popular told him to do that so that she could avoid filling out forms required by the bank. Trial Tr. at 287–88, 323. Furthermore, he points out that there were sixty-nine deposit slips for amounts under $10,000 but eighty slips over $10,000. Trial Tr. at 218–19. The time period for the deposits over $10,000 was June and July of 1994 after Caba had switched banks from Banco Popular, with its allegedly "finicky tellers," to Citibank, thereby supporting his contention that he limited the amounts of his deposits solely at the request of the bank tellers and not to avoid detection.[1] Caba Ltr.Br., dated 12/15/95 at 8, fn. 8. *See also* Trial Tr. at 288; 316–17. In addition, all his financial transactions were conducted by check and fully documented in bank statements, further demonstrating the lack of any intent to conceal his activities. Caba Ltr.Br., dated 12/15/95, at 9, fn. 11. Finally, he alleges that he paid taxes on all the income derived from these transactions.

Based on the above, defendant is now maintaining that his actions do not fall within the "heartland" of the money laundering guideline, § 2S1.1, and that the appropriate guideline to be employed here is the food stamp guideline of § 2F1.1. Furthermore, he claims that an adjustment is merited because he accepted responsibility for his actions, § 3E1.1(a), and a further adjustment for extraordinary family circumstances is appropriate. *United States v. Johnson,* 964 F.2d 124 (2d Cir.1992).

---

1. The Government would have the court discount this argument, for sentencing purposes, on the basis that Caba may have learned that the Currency Transaction Report (CTR) reporting of deposits was not triggered by food stamp deposits in excess of $10,000. No evidence has been offered to support this possibility or to contradict Caba's explanation, which on its face, seems credible. To discount Caba's explanation would require the court to indulge in speculation.

## Discussion

Caba's principal contention is that his activities do not fall within the "heartland" of the money laundering guideline and that the court should downwardly depart and employ as the appropriate guideline the one for unlawful acquisition of food stamps. If the court agrees with the approach urged by Caba, the next issue that must be determined under the food stamp guideline is the amount of loss. Then, the additional issues raised by the parties—role in the offense, obstruction of justice, acceptance of responsibility, and extraordinary family circumstances—will be addressed.

### (1) Money Laundering Guideline— "Heartland"

■ Engaging in money laundering requires that the defendant conduct a financial transaction which involves the proceeds of an unlawful activity; that the defendant knows that the property involved in the transaction is the proceeds of some form of specified unlawful activity; and, that the defendant intends to promote the carrying on of a specified unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i) (1988). Food stamp fraud, involving $5,000 or more worth of food stamps, is a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D). Furthermore, "an intent to launder, disguise or thwart detection of the source or purpose of monies deposited into a bank is not a required element of the section 1956 offense." *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir.1991). According to the Government, depositing the unlawfully acquired funds, in this instance the food stamps, gave Caba an opportunity to hide his illegal activities by giving the funds a veneer of legitimacy. Thus, the Government argues, simply depositing funds into a bank account creates an "intent to promote the carrying on of" the specified unlawful activity, food stamp fraud, pursuant to § 1956(a)(1)(A)(i).

■ While Caba's actions may fall literally within the language of the money laundering statute, § 1956(a)(1)(A)(i), he maintains that his activities were not the type that the statute was aimed at and, therefore, is not within the "heartland" of the related sentencing guideline which was drafted principally with drug trafficking in mind. U.S.S.G. Ch. 1, Part A, 4(b). However, the Government asserts the contrary proposition, citing *United States v. Mohammad Hmeidan*, Criminal Docket No. 94–CR–428 (N.D.Ohio November 14, 1995). In that case, an individual who engaged in approximately $2,500,000 worth of unlawful food stamp transfers as well as additional fraud and money laundering was sentenced at level 26 pursuant to the money laundering guideline, § 2S1.1.

By way of contrast, and more authoritative here, the Second Circuit has held, in *United States v. Skinner*, 946 F.2d 176, 179 (1991), a drug case convicting the defendant of cocaine conspiracy as well as money laundering, that where the conduct was not the type anticipated by the Sentencing Commission, a downward departure could be granted. The Second Circuit, believing that the district judge did not realize that he had the discretion to downwardly depart, remanded for reconsideration. *Id.* In *Skinner*, the court emphasized the ability of a sentencing judge to downwardly depart from the guidelines where mitigating circumstances were not adequately taken into consideration by the Sentencing Commission or where "a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm." *Id.* (quoting U.S.S.G. Ch. 1, Part A, 4(b).)

In *Skinner*, one appellant, Skinner, who was in Vermont, would receive mail shipments of cocaine from Alaska sent by the other appellant, Blodgett. Skinner sold the cocaine to individuals in Vermont and paid Blodgett for the cocaine with money orders which Blodgett deposited in a local bank. *Skinner*, 946 F.2d at 177. The Second Circuit noted that the sending of money to Blodgett only aided Skinner in continuing her cocaine business so that he "would continue to front her the cocaine by sending it through the mail." *Id.* at 179. The Second Circuit found that they did not attempt to conceal a serious crime through their financial transactions: "although the appellants' conduct falls within the words of the Money Laundering Act, the terms of the relevant commentary show that this conduct lies well beyond the 'heartland' or the 'norm.'" *Id.*

*See also United States v. Malfrici,* 1993 WL 127196 (S.D.N.Y. April 21, 1993).

Most relevant here is the commentary to the money laundering sentencing guideline:

The statute covered by this guideline is a part of the Anti–Drug Abuse Act of 1986, and prohibits financial transactions involving funds that are the proceeds of 'specified unlawful activity,' if such transactions are intended to facilitate that activity, or conceal the nature of the proceeds or avoid a transaction recording requirement.... Narcotics trafficking is included as a factor because of the clearly expressed Congressional intent to adequately punish persons involved in that activity. Commentary of § 2S1.1.

It is apparent, therefore, that the money laundering guideline was set at a relatively severe base offense level of 23 with substantial increments depending on the amount of money involved in order to counteract the illegal drug trade in this country. The original statute did not include food stamp fraud as a specified unlawful activity. The addition was made in 1992 as one provision of a very extensive statute, the Housing and Community Development Act of 1992, Pub.L. No. 102–550. The legislative history of the public law reveals nothing about the reason for this amendment. Based on its experience, the only reasonable inference the court is able to draw is that the section was added because, on occasion, food stamp recipients use their food stamps to purchase narcotics to meet the needs of their addiction. There is no indication that Congress intended to equate food stamp fraud with drug trafficking or to escalate it to a crime whose sentencing exposure would be a multiple of what it had been.

The Government correctly points out that the statute covers more than drug trafficking.[2] It notes that the guideline has a specific provision which states: "if the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels." § 2S1.1(b)(1). This provision would not be necessary, the Government argues, if money laundering only encompassed drug-related money laundering. However, specific knowledge of the source of unlawful monies is not a required element for conviction of money laundering; it merely increases a sentence if a defendant has knowledge that the source of the laundered funds was drugs. Moreover, contrary to what the Government argued at sentencing, even as a practical matter, proving the source has nothing to do with what the Government must establish at trial to obtain a conviction. Many defendants in money laundering/drug conspiracy cases can plausibly deny that they knew the unlawful source of the monies was drugs. If convictions for money laundering were not obtainable without proof of drug involvement, one would not be seeing at least eight cases decided in various circuits explaining the purpose and where to apply this enhancement.[3]

Aside from the fact that, as the Government conceded at oral argument, the employment of the statute has almost always been in drug cases, the more important point is

---

**2.** The statute covers, for example, bribery involving the concealment of assets; certain counterfeiting offenses; the smuggling of goods into the United States; theft or embezzlement by bank officers; espionage; fraudulent bank entries; bank or postal robbery and theft.

**3.** *See United States v. Hurley,* 63 F.3d 1 (1st Cir.1995) (finding that direct knowledge or inference from the circumstances is required before a judge can apply § 2S1.1(b)(1)); *United States v. Puckett,* 61 F.3d 1092 (4th Cir.1995) (finding that both § 2S1.1(b)(1) and (2) can be applied to the same sentence); *United States v. Knecht,* 55 F.3d 54 (2d Cir.1995) (defendant's knowledge or belief of source of funds can come from a statement by an undercover agent in a sting operation); *Unit-*

*ed States v. Barton,* 32 F.3d 61 (4th Cir.1994) (actual knowledge of source of funds is required to employ enhancement of sentencing); *United States v. Carr,* 25 F.3d 1194 (3d Cir.1994) (knowledge of source of funds was from drugs can be inferred from defendant's actions); *United States v. Perez,* 992 F.2d 295 (11th Cir.1993) (because defendant knew that funds were represented to be drug proceeds, even though "sham" drug money was used in a sting operation, enhancement could be applied); *United States v. Long,* 977 F.2d 1264 (8th Cir.1992) (knowledge of drug proceeds is necessary to apply enhancement); *United States v. Breque,* 964 F.2d 381 (5th Cir. 1992) (knowledge or belief requirement permits the enhancement to apply to Government sting money).

that the crime here is not the type of major money laundering fraud that would warrant a ten to twelve year jail sentence. The money laundering computations are derived from the guideline's relationship to drug crimes; it is that relationship which drives the high guideline level and would in this case produce a custodial range that grossly exaggerates the seriousness of the actual conduct. Although the Government has tossed the term "food stamp fraud" about rather freely, the thrust of Caba's crime—and the Government's case against him—was not a "ripoff" or diversion of the Government's monies from its intended purposes, but the violation of regulations designed to deter or reduce the opportunity for such diversion. This is why the nature of the fraud and the amount of the actual loss to the Government should be determinative whether the money laundering guideline is the appropriate one to drive the sentencing offense level.

Thus, at sentencing, the Government initially argued that the food stamps that Caba obtained had their origin entirely in the purchase of non-eligible products or cash. When offered the opportunity to make such a showing, the Government declined, and indeed, conceded that an unknown portion of the food stamps which Caba deposited had their source in legitimate food purchases. As the court noted, if the Government could establish the tainted source of all the monies that Caba deposited (i.e. food stamps discounted for cash or used to buy non-eligible food items), this would be powerful evidence that Caba's actions were part of a classic money laundering scheme designed to conceal the sullied monies, and, therefore, the more punitive money laundering guideline would be appropriately used to determine punishment. However, the evidence does not in any way support such a finding.

Caba claims that he did not intend to conceal or launder money or hide any underlying crime. Trial Tr. at 288; 316–17. He maintains "that he paid taxes on the income he received from the four percent commission he charged for the food stamps he redeemed. Moreover, all transactions were conducted by check, thus it was not a cash business intended to defraud the government." Def.'s Sent.Memo. at 11–12. His assertion that he showed all his earnings on his personal tax returns as well as the grocery stores' tax returns is not accurate. Caba's personal tax returns do not reflect his earnings of $660,000 over the two and one-half year period, indicating his participation in tax evasion. But, the store's New York State and Local Sales and Use Tax Returns (Form ST–102) do reflect large gross receipts for non-taxable items (i.e. food) almost equal to the amount that went through his accounts.

The Government maintains that such a recording does not demonstrate that Caba was not attempting to conceal his activity. According to the Government, when a licensed retail store redeems very high amounts of food stamps, one of the most common ways to investigate whether there is any food stamp violation is to compare the store's food stamp redemption activity with its reporting of nontaxable sales on its Sales and Use Tax Returns during a particular period. By comparing those two figures, one can often ascertain whether the high volume in a store's food stamp redemption activity is attributable to legitimate food sales or to illegal food stamp transactions by noting whether there is a significant disparity between the volume of food stamps redeemed by a store and the amount of nontaxable sales (i.e. food sales) reported on the tax returns. Gov't.Ltr.Br., dated 12/15/95 at 4 and Aff. of Laura Riley, Exh. 2. In fact, "[w]ithout a significant discrepancy between those figures, it is extremely difficult for the government to prove any food stamp fraud." Id. at 4. Here, according to the Government, Caba was clever enough to conceal his activities by reporting the amount of non-taxable items equivalent to the monies flowing through his account.

The Government is correct in its argument that the reporting of a large amount of non-taxable sales does not conclusively establish the absence of intent to conceal food stamp violations. Nevertheless, the Government's argument does not answer Caba's contention that were he intending to launder money, he would not have left such a complete and written trail of his involvement. The court

concludes that Caba's use of checks, rather than cash, to pay the truck drivers and wholesalers as well as his written agreement with Mejia, giving him the right to use Mejia's food stamp account, indicates a lack of intent to defraud the Government. For these reasons and because of the lack of any evidence that the crime here involved an $11,700,000 fraud in the classic sense, or of any indication that the sale of illegal drugs was involved in Caba's activities, the court concludes that his offense falls outside of the "heartland" of the money laundering statute and guideline. *See also* Trial Tr. 288–89; 299–300; 302–03; 316–17; 321 (Caba's insisting that he never tried to hide anything from the Government).

The Government analogizes *Caba* to *United States v. Puello*, 21 F.3d 7 (2d Cir.1994), in which the Second Circuit approved the district court's upward departure, in sentencing on a conviction for food stamp fraud, to apply the money laundering guideline, noting the "wide discretion" of district court judges. *Id.* at 10. A close analysis of *Puello*, however, does not support the Government's position either analytically or in the result it seeks here. If anything, it supports the approach urged by the defendant.

Puello was convicted of unlawfully transferring approximately $43 million in food stamps, but for sentencing purposes Judge Denis R. Hurley employed part of the money laundering guideline to determine the amount to be added to the food stamp fraud base offense level. The Second Circuit stated: "[t]he fraud committed here was analogous to money laundering because it allowed others to profit from appellant's criminal activities while remaining free of government scrutiny." *Id.* at 10. So too, here, the Government maintains that, unlike the appellants in *Skinner*, Caba used other people's bank accounts to conceal and promote a multimillion dollar "black market" in food stamps, personally making over $660,000 and effectively ensuring that scores of individuals would continue to engage in food stamp fraud.

Nevertheless, the Government's reliance on this case is not understandable. Although the upward departure was upheld, in fact, Judge Hurley did not adopt the money laundering guideline in toto, but used only that portion, the money chart, relating to the amount involved because, as shall be seen, the food stamp guideline required a showing of loss which the Government could not establish. Thus, employing the food stamp guideline alone led to an inappropriately low sentence. In fact, Puello's total offense level was much lower than it would have been had the money laundering guideline applied straight across the board (using both the base offense level and the level related to the amount involved). The food stamp fraud conviction established a base offense level of 6, and Judge Hurley, then, added 11 levels for the $43,800,000 representing, not the loss to the Government, but the volume of money that went through the account. The court then factored in more than minimal planning and acceptance of responsibility to determine an offense level of 16. The defendant was then sentenced to 21 months' imprisonment and 3 years' supervised release as well as a fine. *Id.* Consequently, in *Puello*, Judge Hurley upwardly departed from the food stamp guideline to reach a reasonable sentence. However, if *Puello* is viewed as a money laundering case, then it represented a downward departure from a total offense level of 33 to a level 16 to reach a reasonable sentence.[4]

Here, however, as the Government would employ the money laundering guideline for a crime similar to *Puello*, the total offense level for Caba would be 34 or a range of 151–188 months, more than seven times the sentence Puello actually received. Such a result would make a mockery of and be utterly at war with one of the two principal aims of the sentencing guidelines, namely, the reduction of sentence disparity. In sum, discounting of

---

4. Applying the money laundering guideline in its entirety, Puello's conduct would result in a total offense level of 33, considering both minimal planning and acceptance of responsibility, because the base offense level for money laundering is 23 plus an increase of 11 levels accounting for the $43,000,000 involved, less 3 for acceptance of responsibility, plus 2 for minimal planning. Thus, Puello would have received a sentence of 135 to 168 months had the money laundering guideline been applied, rather than the 21 months that he in fact received.

food stamps in violation of the USDA's regulations, rather than defrauding the Government, was at the heart of Caba's activities. Thus, his conduct, although falling within the literal definition of money laundering, does not embrace the "heartland" of such an offense. It would be completely contrary to the general purposes of the sentencing guidelines to exponentially increase the seriousness of the defendant's criminal conduct by employing the money laundering guideline as the basis for establishing an appropriate and fair sentence.

### (2) Food Stamp Guideline— Amount of Loss

■ On the other hand, Caba's conduct appears to fall directly within the parameters of the food stamp statute[5] and guideline. Caba recognizes this but, in mitigation, argues that he was providing a valuable and necessary service. He asserts that grocery stores in poor communities, Def's Sent.Mem. at 11, generally do not collect enough food stamps on a short term basis sufficient to allow grocers to deposit the food stamps in the bank. Thus, they are forced to pay the truck drivers with food stamps, and the drivers, in turn, are forced to use an agent like Caba in order to redeem the cash value of the food stamps. Trial Tr. At 98; 104–05. As support for this argument, Caba relates that Chemical Bank and Banco Popular require that the food stamps be submitted in standard paper straps, each with one hundred coupons of the same denomination. Aff. of Magda Jimenez at ¶¶ 3–4 and Def's Ltr.Br., dated 12/15/95, at 5. Thus, these relatively small grocers, Caba claims, would need 100 one-dollar bills or 100 five-dollar bills or 100 ten-dollar bills before they could be deposited. In an extreme scenario, this would mean that a grocer could have $1,584 worth of food stamps and still not be able to deposit them.

The Government points out that those same banks requesting bundling of food stamp deposits, also request bundling of cash deposits, and generally accept small amounts of food stamps even if they are not bundled. Aff. of Laura Riley, Exh. 2 of Gov't Ltr.Br., dated 12/15/95. These bundling requirements are merely preferences in order to save the bank teller time when depositing food stamps. *Id.* Even Banco Popular wrote to Laura Riley, an inspector in the Department of Agriculture, admitting that, while they require food stamp deposits to be made in bundles of 100 of the same currency amount, retailers with small businesses are permitted to make smaller deposits but the same letter notes that this would be done "on an exception basis." Exh. 2c of Gov't Ltr. Br., dated 12/15/95. The Government further responds to this powerful argument by citing Angela Mackey, the field supervisor for the New York City office of the Department of Agriculture. Mackey recommends changing banks if the rules for food stamp collection are difficult to comply with. Aff. of Angela Mackey, Exh. E of Gov't Ltr.Br., dated 12/1/95.

However, grocers use these banks for good reasons. Banco Popular, for instance, is a bank prominent in the Hispanic community because of its bilingual staff and general objective of serving the particular needs of Hispanic clients. Unfortunately, by minimizing these issues, the Government obscures how the banks' rules may have tended to create a market for a service which causes violations of the food stamp regulations, and, more importantly, facilitates the diversion of money from the Government's program. Accordingly, the service of a discounter, like Caba, becomes almost a necessity even for a small retailer who otherwise is selling only what the program allows.

Nevertheless, while Caba may well have provided a much needed service to shop owners who were allegedly making too little money to deposit the food stamps in the requisite bundled packages, the evidence is compelling that, in so doing, he facilitated, even if that was not his intent, the diversion of Government monies from their intended purpose. Furthermore, the evidence demon-

---

**5.** The elements of the food stamp offense are: that the defendant used, transferred, acquired, or possessed food stamp coupons in a manner not authorized by law or by Department of Agriculture regulations; that the defendant acted knowingly and willingly; and, that the food stamp coupons had a value of $100 or more.

strates that he knew that at least some of the food stamps came from the sale of non-food items or non-eligible items, such as beer and cigarettes.[6] Consequently, there is no question that Caba's conduct falls squarely within the food stamp guideline.

■ The problem here, however, is that the true loss incurred by the Government as a result of Caba's activities is almost impossible to calculate with any degree of precision. The commentary, 7(d), to Guideline § 2F1.1 provides that: "In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." The intended beneficiaries of the food stamp program are those individuals to whom the food stamps are issued by the Government. From the testimony at trial and the papers submitted, it appears that there are two parts to the food stamp program—when the food stamp holder gives his stamps to a retailer and when the retailer redeems the stamps he received.

Based on the Sentencing Guidelines definition of loss—as well as in reality—the only time benefits are diverted from intended uses is when recipients sell their food stamps for cash or for a non-eligible item, most notably beer or cigarettes, because the program's purpose is to provide necessary food to indigent individuals. It is at this point that the significance of Judge Hurley's decision in *Puello, supra,* which the Government requests this court follow, becomes apparent. Gov't Ltr.Br, dated 11/15/95, at 4–5 and Gov't Ltr.Br., dated 12/1/95, at 14–15. In a hearing prior to his determination of a proper sentence for Puello, Judge Hurley noted:

> If an individual went into an authorized retailer and bought food stamps, the mere fact that the retailer ... does not take the stamp as he should, and as he's required to do under law, and deposit it in his bank, but instead of that he uses it as essentially the equivalent of currency and buys other foodstuffs from a wholesaler, there, in that instance, I don't think there would be a diversion because, again that person that the program is intended to benefit has

received the intended benefits. Hrg.Tr. in *United States v. Puello,* dated 12/1/95.

Thus, Judge Hurley, in my view, correctly concluded that the method by which the food stamps are redeemed cannot be considered as part of the loss. The redemption violates a Government regulation intended to reduce the likelihood of loss, but it does not itself establish that the Government has incurred a loss.

Because the amount of loss is difficult to establish, the fraud guidelines may not effectively capture the seriousness of the crime. This inability to determine the diversion from the program would have resulted in a minimal sentence for Puello and did result in probation in another similar case before Judge Nickerson, even though millions of dollars were clearly involved. No doubt it was the unacceptable nature of that result that led Judge Hurley in *Puello* to turn to the money laundering guideline in an effort to fashion a more appropriate sentence and, were this the only alternative available, this court would do likewise.

In *Puello,* Judge Hurley upwardly departed, applying the dollar volume of the money laundering provision, § 2S1.1, as distinguished from the loss amount in § 2F1.1, to arrive at an appropriate sentence. *Puello,* 21 F.3d at 9. In *Puello,* the defendant was both a meat wholesaler and retailer. He accepted food stamps for his wholesale business, even though this was against the food stamp guideline, and deposited them in the retail business' bank account. *United States v. Puello,* 814 F.Supp. 1155, 1158 (E.D.N.Y. 1993). And, in *United States v. Garced,* Criminal Docket No. 92–CR–934 (E.D.N.Y. 1992) (unreported), Judge Nickerson, although finding that a meat wholesaler improperly redeemed $82,000,000 in food stamps, did not find that he had caused a loss within the meaning of § 2F1.1. and, therefore, sentenced the defendant using the base level of 6.

At Caba's trial, Iris Sierra testified that while she worked at Bushwick Beer in 1994,

---

**6.** His counsel's insistence otherwise, that Caba was unaware of this, because of an alleged lack of proof in the case, Hrg.Tr., dated 11/16/95, at 12, 18, 19, 41, and 43, only undermines Caba's claim that he is entitled to an adjustment for acceptance of responsibility.

the beer wholesaler accepted as payment approximately $5,000 per month from Caba in return for food stamps used to purchase beer. Trial Tr. at 253. Since Caba was, consequently, arrested in September of 1994, it is presumed that $45,000 loss is demonstrated by these transactions.[7] In addition, the PSR notes that Caba exchanged cash for food stamps in the amount of $20,650. The total loss proven is, thus, $65,650, which under § 2F1.1 would require adding 5 levels to a base offense level of 6, thereby totaling 11. Since in determining an appropriate sentence the court must find, using relevant evidence but not necessarily proof beyond a reasonable doubt, this evidence would be acceptable to establish an amount of loss.

But, a loss of only $65,650 is hardly satisfying because common sense indicates that the loss to the Government must be much greater. Thus, this court is left in the same predicament as Judge Hurley in *Puello* and Judge Nickerson in *Garced.* Millions of dollars have been deposited, but less than one one-hundredth of the total is found to be actual loss.

However, unlike the situation confronting Judge Hurley, this court has the benefit of a report recently released by the USDA entitled "The Extent of Trafficking in the Food Stamp Program" ("USDA Rpt."), published in August 1995, which provides an understanding of the amount of diversion occurring in the food stamp program.[8] Consequently, rather than relying on the number actually proven in this case, or using the money laundering guideline numbers to estimate an amount of loss, it is not inappropriate to rely on this report which directly sought to gather empirical data investigating the extent of diversion in the food stamp program. Exh. B of Caba's Ltr.Br., dated 12/15/95. This approach is further validated by the commentary to the § 2F1.1 guideline which provides:

> [T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on ... the nature and duration of the fraud and the revenues generated by similar operations. § 2F1.1 Commentary ¶ 8.

While the USDA report has some flaws, especially, failing to examine sales of non-eligible items for food stamps, it is the most objective, empirical work provided to the court regarding the extent of loss in the food stamp program. Further, the report candidly discusses ways in which trafficking was both overestimated and underestimated.[9] USDA Rpt. at 8–9. It also established that "[s]tores in the poorest of poor neighborhoods [presumably Caba's area of operation] are significantly more likely to engage in trafficking than stores located elsewhere." *Id.* at 6.

Although the report found that smaller stores engaged in more trafficking than larger stores, the court will give the defendant the benefit of the doubt and will use the lowest percentage of trafficking, which is

---

7. This is only a loss, as defined in the food stamp guideline, § 2F1.1, if the beer distributor sold the beer to individual customers for food stamps as opposed to the beer distributor accepting from the retail groceries food stamps for the beer. The latter situation would, as with the truck drivers, not be a diversion of Government funds.

8. *The very existence of this report undermines* the Government's initial argument that it should be presumed that all of the $11,700,000 that went through Caba's account had its origin not simply in violations of the USDA's regulations, but in the diversion of the Government's monies from its intended beneficiaries. Caba's explanation of the need he met is far more consistent with the Government's own evidence at trial. For example, the Government offers nothing to rebut the argument that the truck drivers would

have no need for Caba's services were they able to make food stamp deposits themselves.

9. Most notably, the report notes that trafficking is overestimated because "very conservative figures [are used] to estimate the percentage of legitimate food sales by violating stores. The estimate of trafficking diversion would be lower to the extent that legitimate food sales account for a larger portion of the redemptions in trafficking stores." Furthermore, the report overestimated the amount of fraud in the program by selecting highly-suspicious stores and moderately-suspicious stores to monitor for the study rather than purely a random sample.

Underestimation, for example, may occur because some violating stores only traffic with people they know, not strangers, and thus investigators cannot catch this type of trafficking.

found in supermarkets—4.2%. USDA Rep. at 4. Thus, because proof at trial established that $11,700,000 went through Caba's account, the approximate loss to the Government based on the 4.2% figure is $491,400.

### (3) The Sentencing Calculation under Guideline § 2F1.1

With this background, the court concludes that Caba should be sentenced under § 2F1.1 which provides a base offense level of 6 and an additional 9 levels for a loss greater than $350,000. In addition, the total offense level increases by 2 because Caba engaged in more than minimal planning—he ran this "business" for two and one-half years.

■ The Government attempts to enhance the sentence claiming that Caba had an aggravating role in the offense, arguing that Joselin Mejia, Cruz Tavarez, Caba's store employees, Maritza Caba, and the owner of Bushwick Beer all acted under Caba. Section 3B1.1(a) of the Sentencing Guidelines states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." Similarly, § 3B1.1(b) provides: "If the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." The commentary notes that a leadership role is distinguished from mere management or supervision based on the decision making authority of the defendant; the nature of participation in the commission of the offense; the recruitment of accomplices; the degree of control exercised over others, among other things.

In the court's view, Caba was neither a leader nor an organizer. He did not require others to work for him; the decisions he made in the scheme did not affect the others' actions except for the employees of his grocery; and, it seems that almost all of the others—the truck drivers, in particular—involved in the scheme would have found a different discounter to redeem their improperly acquired food stamps. Mejia, because of financial problems, would gladly have contracted out the use of his authorized food stamp bank account without Caba's interven-

tion. It does not appear that Caba exercised any compelling force or discretion over any of the major players involved. As Caba himself maintains, he certainly had no supervisory role over the truck drivers or wholesalers.

In addition, although the Government argues that Caba was managing his store employees who aided him in his criminal activity, the fact is that they played a minor role in the totality of the scheme. Their duties, insofar as they assisted Caba, were ones that Caba could have easily accomplished without them. For the similar reason, this court does not think it appropriate to consider him a manager either. Moreover, the two point enhancement for engaging in more than minimal planning, which he has already received, is in the court's view more reflective of how his activities should be viewed. The court, therefore, sees no reason to apply § 3B1.1.

■ The Government has also requested an upward adjustment for obstruction of justice which the court believes is not warranted. The Government maintains that at trial Caba testified that he did not know his actions were illegal when conducting the financial transactions and since the jury found him guilty, Caba had to have the requisite knowledge of illegality. Even if true, this does not constitute obstruction of justice within the meaning of U.S.S.G. § 3C1.1. In fact, the Second Circuit has held that "Section 3C1.1 contains a clear mens rea requirement that limits its scope to those who 'willfully' obstruct or attempt to obstruct the administration of justice ... [W]e are convinced that the word 'willfully,' as used in section 3C1.1, requires that the defendant consciously act with the purpose of obstructing justice." *United States v. Stroud*, 893 F.2d 504 (2d Cir.1990). Similarly, the commentary to this section of the Sentencing Guidelines provides: "This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt ... is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G.

§ 3C1.1 Application Note 1; *see also United States v. Franco–Torres,* 869 F.2d 797, 801 (5th Cir.1989). Thus, in viewing the testimony in the light most favorable to Caba, the court notes that the thrust of his testimony was that he was not seeking to conceal his activities and that he did not intend to facilitate a fraud on or cause a loss to the Government. Although, in the court's view, Caba was deliberately closing his eyes to what might be occurring, still it is not inconceivable that he viewed his activities as violating some technical regulations of the Government without intending or causing any real loss to the Government. Accordingly, the mens rea requirement of this guideline has not been conclusively established here so as to compel a finding of obstruction under the guideline.

■ At the same time, the court rejects Caba's contention that because he did not believe he had done any harm by his activities that there should be a downward adjustment for acceptance of responsibility. Hrg. Tr., dated 11/16/95, at 45. Merely testifying in one's own interest and filing personal and business tax returns does not lead to such a downward adjustment. The court believes that Caba was well aware that he was violating USDA's rules and, whatever flaws these rules might have, they are meant, however ineptly, to prevent diversion of Government funds from the program's intended purposes. While Caba may have viewed himself as providing a necessary discounting service, he also knew that he was not authorized to proceed in his operations, as he did, and, by doing so, he was facilitating the diversion of government funds even if that was not his intent. His persistent refusal to acknowledge this makes any downward adjustment for acceptance of responsibility inappropriate.

Lastly, although Caba requests a downward departure for extraordinary family circumstances, the court does not find anything in Caba's circumstances that sets him apart from other defendants who have been their family's sole bread winner or whose children will have difficulty in dealing with their father's incarceration to merit a downward departure.

In light of the above, the proper sentencing level for Caba would be 17, 6 as the base offense for unlawful acquisition of food stamps, plus 9 for the amount of loss of over $350,000, plus 2 as the offense involved more than minimal planning.[10] However, because the evidence is compelling that Caba was also engaging in tax evasion, the court will downwardly depart only to level 19.[11]

### Conclusion

Because the court finds that Caba's activities are not within the heartland of the money laundering guideline, § 2S1.1, it will apply, via a downward departure, U.S.S.G. § 2F1.1, the food stamp guideline. The difficulty, however, that the courts have found in using the food stamp guideline is in calculating the loss, which only can be the amount of food stamps that had been traded for cash or exchanged for illegitimate purchases, and not the amount the defendant received for discounting prior to redeeming them. By employing the report issued by the Department of Agriculture on this question and giving Caba the greatest benefit of the doubt, this court can fairly calculate the loss to be approximately $490,000. Accordingly, for the reasons explained, the court finds the appropriate sentencing level to be 19, with a range of 30 to 37 months.

---

10. Had this court adopted the approach employed by Judge Hurley in *Puello,* the result would have been identical. A base level of 6 from the food stamp guideline, plus 9 levels from the money laundering guidelines (for an amount of 11.7 million dollars), plus an additional 2 levels for minimal planning.

11. If Caba had been charged with both unlawful acquisition of food stamps and tax evasion, but

not money laundering, the resulting offense level, 19, would have been the same. The food stamp count and the tax evasion count would not have been grouped since none of the four grouping rules at U.S.S.G. § 3D1.2 would be applicable, and under the unit system of U.S.S.G. § 3D1.4, two levels would be added to the count with the highest offense level, 17, to produce a combined adjusted offense level of 19.