165 F.3d 34
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Tyrone WATFORD, Defendant-Appellant.
 No. 98-2161.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 8, 1998.
Decided Nov. 9, 1998.
 
 Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. No. 3:96-CR-20. Robert L. Miller, Jr., Judge.
 Before Hon. RICHARD A. POSNER, Chief Circuit Judge, Hon. WALTER J. CUMMINGS, Hon. JESSE E. ESCHBACH, Circuit Judges.
 
 ORDER
 
 1
 Tyrone Watford pleaded guilty to redeeming illegally received food stamps in violation of 7 U.S.C. § 2024(c), and to laundering money in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The district court sentenced Watford to 135 months' imprisonment for the § 1956 violation, and to 60 months' imprisonment for the § 2024 violation, with the terms to be served concurrently. The court reached the figure of 135 months by applying U.S.S.G. § 2S1.1, the Sentencing Guideline corresponding to the money laundering offenses defined in § 1956. In his guilty plea agreement, Watford retained his right to appeal the issue of whether the district court should have departed downward from U.S.S.G. § 2S1.1--and that is the issue that now confronts this court. Because the district court did not abuse its discretion in determining that Watford's offense fell within the "heartland" of § 2S1.1, we affirm.
 
 BACKGROUND
 
 2
 Watford owned and operated a grocery store named Linden Market. From approximately January 1992 to November 1993, Watford continually purchased large quantities of food stamps at a discount close to 30% and deposited them into the savings and checking accounts of Linden Market. He funded each purchase by withdrawing money from the same bank accounts. The money usually was withdrawn as soon as the stamps were deposited; most, but not all, of it was used to purchase more stamps, always at the same illegal discount rate. According to an IRS agent, deposits into the savings account during 1992 and 1993 totaled $677,525, of which $666,872 went in as food stamp deposits. The corresponding figures for the checking account were $49,903 and $29,392. Cash withdrawn from the savings account totaled $658,374.
 
 
 3
 Linden Market was minimally stocked and, in 1992 and 1993, the store appears to have served basically as a front for Watford's illegal food stamp "business." One of Watford's cellmates (who had a lengthy prior felony record) testified that Watford told him that he had made over $375,000 in his food stamp scheme.
 
 
 4
 Alerted by the large quantities of stamps flowing through the accounts of this little grocery store, the United States Department of Agriculture began to investigate Linden Market. On May 1, 1996, Watford was charged in a twenty-five count indictment. On January 16, 1998, after months of pretrial proceedings, Watford pleaded guilty to Count Five (redemption of illegally received food stamps in violation of 7 U.S.C. § 2024(c)) and Count Six (money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). In exchange, the government agreed to drop all of the other counts.
 
 
 5
 Section 1956(a)(1)(A)(i) is applicable to "[w]ho[m]ever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity." Section 2024(c) states that "[w]hoever presents or causes to be presented, coupons for payment of redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter, shall be guilty of a felony."
 
 
 6
 U.S.S.G. § 2S1.1 is the "money-laundering" guideline, i.e. the guideline that corresponds to violations of 21 U.S.C. § 1956(a)(1)(A)(i).
 
 
 7
 U.S.S.G. § 2F1.1 is the "fraud" guideline, i.e. the guideline that corresponds to violations of 7 U.S.C. § 2024(c).
 
 
 8
 In his guilty plea agreement, Watford retained his right to appeal the issue of "[w]hether the [c]ourt should apply the money laundering guidelines to the offense of conviction ... or whether the [c]ourt should apply the food stamp fraud guideline to said conduct." Despite this language, the essence of Watford's argument at the sentencing hearing was that the district court should depart downward from § 2S1.1, and that it should determine the extent of the departure by reference to § 2F1.1. That is how the government understands the issue on appeal, even though at times (but only at times) Watford continues to couch his argument in terms of whether the district court should have "applied" § 2F1.1 rather than § 2S1.1. The district court, on the other hand, appears to have concluded that Watford was couching an "application" argument in terms of a departure argument. However that might be, in its sentencing findings the district court addressed, and rejected, both Watford's argument that the appropriate guideline was § 2F1.1, and his argument that the court should depart downward from a sentence reached under § 2S1.1.
 
 
 9
 In refusing to depart downward from the money-laundering guideline, the district court found that Watford had used the money generated by the food stamp fraud "to promote the same illegal activity that produced it." The court noted that Watford had "managed to prey on one of the neediest groups of people that can be found in this country." Using the November 1997 version of the Guidelines, the court began with a base offense level of 23 pursuant to § 2S1.1. The court then properly applied various enhancements, and reached a total offense level of 31. The court further, and correctly, concluded that Watford had a criminal history category of III, for he had been convicted in 1990 of conspiracy to file false applications and documents and obstruction of justice. The combined calculation produced a sentencing range of 135 to 168 months, and the court sentenced Watford to the bottom end of that range.
 
 ANALYSIS
 
 10
 On appeal, Watford maintains that the court erred as a matter of law in refusing to grant him a downward departure from the imprisonment range reached under § 2S1.1. He relies on the Supreme Court's decision in Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), and, in particular, on the rationale set forth by the district court for the Eastern District of New York in United States v. Caba, 911 F.Supp. 630 (E.D.N.Y.1996), a decision upheld by the Second Circuit in an unpublished order, 104 F.3d 354 (2d Cir.1996).
 
 
 11
 The defendant in Caba purchased food stamps at a lower discount rate (approximately 5%), but he laundered nearly $12,000,000 of stamps over a period of two and a half years and, as a result, made a personal profit of over $660,000. The Caba district court departed downward from the otherwise applicable range under § 2S1.1 after concluding that Caba's laundering of the proceeds of food stamp fraud was outside the "heartland" of § 2S1.1. Caba, 911 F.Supp. at 635, 642. The court reasoned that § 1956 was originally intended to combat major drug offenses rather than arguably less serious abuses of the kind Caba committed. Id. at 635. The court determined the extent of its downward departure by reference to § 2F1.1. Id. at 642. Caba's sentencing level was set at 19, with a sentencing range of 30 to 37 months.
 
 
 12
 In sentencing Watford, Judge Miller made the legal determination that Watford's conduct fell within the "heartland" of § 2S1.1. This court has jurisdiction to review legal conclusions made in the sentencing process under 18 U.S.C. § 3742(a)(1). See also United States v. Carter, 122 F.3d 469, 472 (7th Cir.1997).
 
 
 13
 "We review a district court's evaluation of whether a particular set of facts takes a case outside the heartland for an abuse of discretion." United States v. Santoyo, 146 F.3d 519, 525 (7th Cir.1998). Watford asks this court to follow Caba's rationale and to hold, as a matter of law, that laundering the proceeds of food stamp fraud, at least to the extent that the aim of the laundering offense is not to further other offenses of the type originally envisaged by the Sentencing Commission, falls outside the heartland of § 2S1.1. Watford argues that since § 1956, in its original form, did not include food stamp fraud as a specified unlawful activity, it follows that when it created § 2S1.1, the Sentencing Commission could not have "adequately taken into account" that the guideline would be applied to laundering cases involving food stamp fraud. Cf. Caba, 911 F.Supp. at 635. Accordingly, Watford argues that his case by definition falls outside the heartland of § 2S1.1, and that the district court abused its discretion in reaching the opposite conclusion.
 
 
 14
 The Caba sentencing court pointed out that § 1956 was introduced as part of the Anti-Drug Abuse Act of 1986 (enacted six months before the Guidelines were promulgated), and that food stamp fraud was added as a specified unlawful activity only in a 1992 amendment. On appeal, albeit in an unpublished order, the Second Circuit sustained the sentencing court's conclusions that "the relatively severe base offense level established by § 2S1.1 was established primarily, but not exclusively, in order to fight the illegal drug trade, [and] that the guideline has been used almost entirely in the context of drug trafficking." United States v. Caba, 104 F.3d 354, 1996 WL 685764,* 3 (2nd Cir.1996). Even the Second Circuit, however, acknowledged that "a food stamp fraud may be within the 'heartland' of the guideline when, for example, there is serious money laundering or unusually severe fraud involved ." Id. at 4.
 
 
 15
 In finding that Caba was not guilty of such a "serious" offense, the sentencing court had noted that he paid for his food stamps with checks rather than cash. The court's view was that paying with checks indicated a "lack of intent to defraud the government." 911 F.Supp. 630, 636. In addition, the court concluded that the government had not proven that Caba had knowledge of the "tainted" nature of the food stamps he was purchasing; rather, the court believed that he thought he was simply doing a favor for the truck drivers, who were accepting food stamps as payment from stores. Thus, the Caba sentencing court concluded that "discounting of food stamps in violation of the USDA's regulations, rather than defrauding the government, was at the heart of Caba's activities"; otherwise put, "the thrust of Caba's crime ... was not a 'ripoff' or diversion of the Government's monies from its intended purposes, but the violation of regulations designed to deter or reduce the opportunity for such diversion." Caba, 911 F.Supp. 630, 636.
 
 
 16
 Accordingly, the government argues that the facts of Caba "differ dramatically" from those of the present case. Essentially it advances this purported distinction by pointing out that in Caba the defendant, rather than purchasing food stamps at a 30% discount, "was charging a four or five percent fee, converting food stamps to cash for truck drivers." It is questionable whether this is a persuasive distinction, for one may argue that Caba only needed to charge a small "fee" because of the vast quantity of stamps he was purchasing. However that might be, the district court implicitly found that Watford's fundamental intent was to defraud the government, and such an offense is sufficiently serious to fall within the heartland of § 2S1.1.
 
 
 17
 Moreover, we agree with the district court's conclusion that Caba's reasoning is "unpersuasive." Section 2S1.1 provides for an offense level enhancement of three levels for defendants who knew that the laundered funds were the proceeds of "an unlawful activity involving the manufacture, importation, or distribution of narcotics ." Thus, we conclude that the Commission must have envisaged that the guideline would be applied to non-drug-related offenses. Cf. United States v. Barton, 76 F.3d 499, 503 (2d Cir.1996) (fact that defendant, convicted of ordering child pornography by mail, did not sexually abuse children is not a ground for downward departure when relevant guideline specifically provides for an increase when a defendant has sexually abused children).
 
 
 18
 We note that the Caba court offered a different explanation for the three-level increase, to wit: in some cases the government will have good reason to believe, but will not be able to prove, that the defendant knew the money he was laundering came from the proceeds of drug-related activity. By denying such knowledge, many drug-money launderers would be able to avoid sentencing under the guideline altogether. So the structure of § 2S1.1 might be merely a technical way of reaching such defendants. While this interpretation of the three-level increase is not entirely implausible, we conclude that, in the lack of any specific evidence to the contrary, the interpretation we adopt follows more naturally from the plain language of the statute.
 
 
 19
 Section 2S1.1 sets a base offense level of 23 for violations of § 1956(a)(1)(a) in part because that "subsection[ ] appl[ies] to defendants who encouraged or facilitated the commission of further crimes." U.S.S.G. § 2S1.1, comment. In sentencing Watford, the district court observed that the money Watford repeatedly withdrew from the bank to fund his illegally discounted food stamp purchases itself came from the deposit of food stamps in the same bank. The court specifically emphasized that Watford deposited the stamps in order to "promote additional criminal conduct." Watford argues that "food stamps cannot be negotiated without the retailer having a bank account." His point is that if the underlying crime is viewed as the entire two-year string of illegal food stamp fraud, then it is not clear that his financial transaction, i.e., the depositing of the stamps in the bank, was a "further" crime.
 
 
 20
 We conclude that the plain language of § 2S1.1 does apply to ongoing criminal activity of the type in which Watford engaged. Cf ., e.g., United States v. Hildebrand, 152 F.3d 756, 762-763 (8th Cir.1998) (defendants who gathered cash through mail fraud and deposited cash in bank were guilty of a "reinvestment money laundering offense"; such offenses involve "plowing ... illegal proceeds [back] into the unlawful scheme" and are punished more severely than "concealment" money laundering offenses "because reinvested proceeds generate further criminal activity").
 
 CONCLUSION
 
 21
 The district court did not abuse its discretion in determining that Watford's conduct falls within the heartland of § 2S1.1. Therefore we AFFIRM the district court's sentence.